Jason Farrell MCGEHEE; Stacey Eugene Johnson; Marcel Wayne Williams; Kenneth Dewayne Williams; Bruce Earl Ward; Ledell Lee; Jack Harold Jones, Jr.; Don William Davis; Terrick Terrell Nooner, Plaintiffs–Appellees,

v.

Asa HUTCHINSON, Governor of the State of Arkansas, in his official capacity; Wendy Kelley, Director, Arkansas Department of Correction, in her official Capacity, Defendants–Appellants.

No. 17-1804

United States Court of Appeals, Eighth Circuit.

Submitted: April 17, 2017

Filed: April 17, 2017

Scott Braden, Julie Vandiver, John Charles Williams, Assistant Federal Public Defenders, Federal Public Defender's Office, Little Rock, AR, for Plaintiffs–Appellees Jason Farrell McGehee (State Prisoner: 000946), Marcel Wayne Williams (State Prisoner: 000943), Don William Davis (State Prisoner: 000920), and Terrick Terrell Nooner (State Prisoner: 000926).

Jeffrey M. Rosenzweig, Little Rock, AR, for Plaintiffs–Appellees Stacey Eugene Johnson (State Prisoner: 000933), Kenneth Dewayne Williams (State Prisoner: 000957), and Jack Harold Jones, Jr. (State Prisoner: 000940).

Scott Braden, Julie Vandiver, John Charles Williams, Assistant Federal Public Defenders, Federal Public Defender's Office, Little Rock, AR, Jennifer A. Merrigan, Philadelphia, PA, Joseph J. Perkovich, Phillips Black Project, New York, NY, for Plaintiff–Appellee Bruce Earl Ward (State Prisoner: 000915).

Lee Deken Short, Short Law Firm, North Little Rock, AR, for Plaintiff–Appellee Ledell Lee (State Prisoner: 97101).

Nicholas Jacob Bronni, Colin Jorgensen, Jennifer L. Merritt, Lee P. Rudofsky, Attorney General's Office, Little Rock, AR, for Defendants–Appellants.

Before WOLLMAN, LOKEN, RILEY, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges.[1]

PER CURIAM.

The State of Arkansas moves to vacate stays of execution of nine sentences of death entered by the district court on Saturday, April 15, 2017. The first execution is scheduled for today, April 17, at 7:00 p.m. The State moved to vacate the stays at approximately 6:00 p.m. on April 15. The prisoners responded at 1:16 a.m. today, April 17. The State filed a reply at 10:04 a.m. today. Due to the exigency of time, we dispense with a lengthy statement of procedural history and state our conclusions concisely. The judges in regular active service voted to hear the motion initially en banc.

The stays of execution were entered in an action brought by nine Arkansas prisoners under 42 U.S.C. § 1983. The inmates were all convicted of murder and sentenced to death. Governor Hutchinson of Arkansas scheduled executions for eight of the prisoners to occur on April 17, 20, 24, and 27, 2017, two per day. As relevant here, the complaint alleges that use of the State's method of execution, by itself and in combination with the execution schedule, would constitute cruel and unusual punishment that violates the Eighth and Fourteenth Amendments. The State's current lethal injection protocol calls for injection of 500 milligrams of midazolam, followed by 100 milligrams of vecuronium bromide, followed by 240 milliequivalents of potassium chloride. If the prisoner remains conscious after the injection of midazolam, however, the executioner will inject another 500 milligrams of midazolam before injecting vecuronium bromide.

---

**1.** Chief Judge Smith did not participate in the consideration or decision of this matter.

■ The district court based its order staying the executions on three principal conclusions: (1) the inmates did not delay unnecessarily in bringing this action, (2) "there is a significant possibility that plaintiffs will succeed in showing that the use of midazolam in the ADC's current lethal injection protocol qualifies as an objectively intolerable risk that plaintiffs will suffer severe pain," and (3) there is a significant possibility that the risk of severe pain arising from Arkansas's proposed method of execution is substantial when compared to known and available alternative methods. The district court conducted a four-day hearing and produced a 101–page order under great time pressure, and we commend the court for its diligence. For the following reasons, however, we conclude that the district court abused its discretion in staying the executions, and we therefore grant the State's motion to vacate the stays.

■ *First*, "[a] court considering a stay must . . . apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill v. McDonough*, 547 U.S. 573, 584, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) (quoting *Nelson v. Campbell*, 541 U.S. 637, 650, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004)). The record here shows that the prisoners could have brought their § 1983 method-of-execution claim much earlier and intentionally declined to do so.

The Arkansas legislature adopted the current method of execution in 2015. On April 6, 2015, several of the prisoners sued in Arkansas state court to challenge the constitutionality of the law under both the Arkansas Constitution and the federal Constitution. After the State removed the case to federal court, however, the prisoners voluntarily dismissed the case without prejudice on April 18, 2015. They then filed a new action in Arkansas state court that omitted the federal claims and alleged only violations of Arkansas law. After more than a year of litigation, the Arkansas Supreme Court—applying the same standards that apply under the Eighth Amendment of the federal Constitution— dismissed the prisoners' claim that the method of execution constituted cruel or unusual punishment in violation of the Arkansas Constitution. *Kelley v. Johnson*, 2016 Ark. 268, 496 S.W.3d 346, 357-60 (2016), *cert. denied*, —— U.S. ——, 137 S.Ct. 1067, 197 L.Ed.2d 235 (2017).

On February 27, 2017, six days after the Supreme Court denied certiorari in *Kelley*, the Governor scheduled executions for eight of the inmates to occur in April 2017. Finally, on March 27, 2017, only three weeks before the first scheduled execution, the plaintiffs brought this action to challenge the method of execution under the Eighth Amendment of the federal Constitution.

The prisoners' long delay in pursuing their federal claim should have created a strong equitable presumption against the grant of a stay. The prisoners voluntarily elected to forego their federal claim in April 2015 and chose instead to challenge the method of execution exclusively in state court under the Arkansas Constitution. Only after the Arkansas Supreme Court rejected their state-law claim, the Supreme Court denied certiorari, and the Governor scheduled the executions did the prisoners present a federal claim in federal court. The claim on which the district court based the stays of execution—that the three-drug lethal injection protocol allegedly violates the Eighth Amendment— could have been litigated at the same time as the state constitutional claim beginning in April 2015. Whether or not the claim technically is barred by doctrine of res

judicata or collateral estoppel, the prisoners' use of "piecemeal litigation" and dilatory tactics is sufficient reason by itself to deny a stay. *Hill*, 547 U.S. at 584-85, 126 S.Ct. 2096.

Although the district court said that a risk of pain arising from the lethal-injection protocol is "exacerbated" by the Governor's execution schedule, R. Doc. 54, at 56, the court did not explain why. The alleged risk of pain from the drug protocol is the central basis for the district court's order granting stays. The prisoners could have challenged the protocol beginning in April 2015. We are not convinced that the execution schedule is material to the question whether stays are warranted based on the lethal-injection protocol.

 *Second*, the district court's conclusion concerning the use of midazolam in the Arkansas execution protocol did not apply the governing standard and was not adequately supported by the court's factual findings. To establish a violation of the Eighth Amendment, prisoners must show that the method of execution is "*sure or very likely* to cause serious illness and needless suffering." *Glossip v. Gross*, —— U.S. ——, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion)). While the district court found a significant possibility that the prisoners could show an "objectively intolerable risk" of severe pain, the court never found that the prisoners had a likelihood of success under the rigorous "sure or very likely" standard of *Glossip* and *Baze*. Although the court recited the "sure or very likely" standard in its preliminary discussion, R. Doc. 54, at 55, the court never applied it when discussing whether stays of execution were justified.

The district court's factual findings would not support a conclusion that the prisoners have a likelihood of success in showing that the execution protocol is sure or very likely to cause severe pain. Much of the district court's order highlights the equivocal nature of the evidence. The court observed that there are no scientific studies conducted in humans about the effects of the dosage of midazolam that would be administered under the protocol. One human study involving smaller doses was "mixed in terms of supporting either side's theory." R. Doc. 54, at 58. The court discussed the alleged "ceiling effect" for midazolam, under which effectiveness levels off at a certain dosage, but concluded that if there is a ceiling effect, the level is unknown. *Id.* at 60. Evidence from executions in other jurisdictions was of "limited relevance." *Id.* at 69; *see In re Ohio Execution Protocol*, No. 17-3076, —— F.3d ——, ——, 2017 WL 1457946, at *22 (6th Cir. Apr. 25, 2017) (Kethledge, J., dissenting). There is no express finding of fact that the prisoners are likely to prove that a 500–milligram injection of midazolam will fail to anesthetize the prisoners during the execution or that use of the lethal-injection protocol is sure or very likely to cause severe pain. Instead, the district court found that "there appears *at least a possibility* that if the midazolam does not operate as defendants predict . . ., the inmate may regain some level of consciousness during the process before the second and third drugs are administered." R. Doc. 54, at 72-73.

The district court appeared to acknowledge that there was no "well-established scientific consensus" that the use of midazolam in conjunction with the other two drugs was very likely to cause severe pain. *Id.* at 68-69. But the district court thought this standard—urged by Justice Alito in *Baze* to avoid "embroil[ing] the States in never-ending litigation concerning the adequacy of their execution procedures," 553

U.S. at 63, 67, 128 S.Ct. 1520 (Alito, J., concurring)—"seems like a high bar to reach and level of certainty to achieve based on the evidence of which the Court is aware at this stage of the proceeding and the limitations of human study at 500 mg, 1,000 mg, or higher doses of midazolam." R. Doc. 54, at 69.

■ "When a method of execution is authorized under state law, a party contending that this method violates the Eighth Amendment bears the burden of showing that the method creates an unacceptable risk of pain." *Glossip*, 135 S.Ct. at 2741. If there is no scientific consensus and a paucity of reliable scientific evidence concerning the effect of a lethal-injection protocol on humans, then the challenger might well be unable to meet this burden. The equivocal evidence recited by the district court falls short of demonstrating a significant possibility that the prisoners will show that the Arkansas protocol is "sure or very likely" to cause severe pain and needless suffering.

■ *Third*, we disagree with the legal standard that the district court applied in determining whether alternative methods of execution are known and available. We do not say that an alternative method must be authorized by statute or ready to use immediately, but we concur with the Eleventh Circuit that the State must have access to the alternative and be able to carry out the alternative method relatively easily and reasonably quickly. *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1300 (11th Cir. 2016), *cert. denied*, — U.S. —, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017).

■ The district court thought this standard places an "impossible burden" on the prisoners. We think it is necessary to conform to the Eighth Amendment. Unless an alternative is feasible and readily imple-

mented in the sense described, the State has a legitimate penological justification for adhering to its current method of execution in order to carry out lawful sentences. *See Baze*, 553 U.S. at 52, 128 S.Ct. 1520 (plurality opinion). When availability (or effectiveness) of an alternative is more speculative, a State's refusal to discontinue executions under the current method is not blameworthy in a constitutional sense. *See Baze*, 553 U.S. at 67, 128 S.Ct. 1520 (Alito, J., concurring). The "reasonable possibility" standard urged by the prisoners based on *In re Ohio Execution Protocol*, —— F.3d at ——, 2017 WL 1457946, at *9, is insufficient to establish that an alternative method is available, feasible, and readily implemented. *See id.* at —— – ——, 2017 WL 1457946, at *23-24 (Kethledge, J., dissenting).

Under our view of the correct legal standard, we cannot agree with the district court that the prisoners have demonstrated a significant possibility of establishing a known and available alternative that would significantly reduce a substantial risk of severe pain. Even assuming a risk of pain from the current method, the availability of the several methods cited by the district court is too uncertain to satisfy the rigorous standard under the Eighth Amendment.

The possibility that Arkansas could acquire pentobarbital for use in executions is too speculative to justify stays of execution. Arkansas made at least three unsuccessful inquiries about obtaining barbiturates in 2015, and the difficulty of obtaining drugs for use in lethal injection is well documented. Sevoflurane gas and nitrogen hypoxia have never been used to carry out an execution. With no track record of successful use, these methods are not likely to emerge as more than a "slightly or marginally safer alternative." *Glossip*, 135 S.Ct. at 2737; *see Baze*, 553

U.S. at 41, 128 S.Ct. 1520 (discussing "untried and untested alternatives"). The firing squad has been used by only one State since the 1920s. It requires trained marksmen who are willing to participate and is allegedly painless only if volleys are targeted precisely. The record comes short of establishing a significant possibility that use of a firing squad is readily implemented and would *significantly reduce* a substantial risk of severe pain.

For these reasons, the stays of execution entered on April 15, 2017, R. Doc. 54, are vacated.

KELLY, Circuit Judge, dissenting.

This case is not only about midazolam. Any increased risk of pain from midazolam in this case is compounded here by the compressed execution schedule and Arkansas' execution procedures. Together, these factual elements fully support the district court's conclusion that using midazolam to execute eight men over an eleven day period with limited contingency procedures creates a substantial risk of serious harm. I would hold that the district court did not err in concluding that the appellees' midazolam claim, standing alone, supports a grant of preliminary injunction. But, more significantly, the district court did not clearly err in concluding that, in combination, the risks inherent in the state's procedure likely violate the Eighth Amendment. See Lopez v. Brewer, 680 F.3d 1068, 1074 (9th Cir. 2012) ("The relevant inquiry ... is whether [the sequence of events], either individually or in combination, lead to an objectively intolerable risk of pain."); Valle v. Singer, 655 F.3d 1223, 1228 (11th Cir. 2011) (addressing petitioner's claim that the "replacement of sodium thiopental with pentobarbital when combined with Florida's history and the deficiencies in its procedures subjects him to a substantial risk of serious harm").

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Glossip v. Gross, —— U.S. ——, 135 S.Ct. 2726, 2736, 192 L.Ed.2d 761 (2015) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). We review a district court's grant of preliminary injunction and stay of execution for abuse of discretion. Nooner v. Norris, 491 F.3d 804, 807 (8th Cir. 2007). "An abuse of discretion occurs when the district court bases its decision on an erroneous application of the law or a clearly erroneous finding of fact." See Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 967 (8th Cir. 2005).

Contrary to the court's conclusion, the district court based the preliminary injunction at least in part on appellees' combined claim that midazolam, the compressed execution schedule, and Arkansas' execution procedures violate the Eighth Amendment. (Prelim. Inj. Order at 22–28, 37–45, 53, 56; id. at 73–74 ("[T]he schedule imposed on these officials ... causes concern. For these reasons, the Court finds that there is a significant possibility that plaintiffs will succeed on the merits under the first prong of *Baze/Glossip*.")). The compressed execution schedule is a crucial component of the combined claim. The appellees could not have brought this claim until the Governor set their execution dates on February 27, 2017. By filing their complaint in federal court on March 27, 2017, they diligently and timely pursued their combined claim.

Because the midazolam method of execution claim is integral to both Eighth Amendment claims, I address the state's midazolam-related arguments first. I then

turn to the ultimate issue: whether the district court abused its discretion in granting a preliminary injunction on the combined method of execution claim ("combined claim") that the use of midazolam together with the expedited execution schedule and Arkansas' execution protocols violates the Eighth Amendment. Finally, I consider the claim appellees raised in their cross appeal that the state's compressed execution schedule violates the nation's evolving standards of decency.

## I. Midazolam Method of Execution Claim

To bring an Eighth Amendment challenge to a method of execution, a plaintiff must establish "that the State's lethal injection protocol creates a demonstrated risk of severe pain. [And] [h]e must show that the risk is substantial when compared to the known and available alternatives." Glossip, —— U.S. ——, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015) (alteration in original) (quoting Baze v. Rees, 553 U.S. 35, 61, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008)). "The preliminary injunction posture of the present case thus requires petitioners to establish a likelihood that they can establish both" of those prongs. Id. The state argues that the appellees have failed to prove both prongs of the Glossip test, because they have not shown that midazolam creates a demonstrated risk of severe pain, or that a readily available alternative execution method exists.

### 1. Substantial risk of serious harm

The state argues that the district court erred in entering the preliminary injunction because the appellees failed to establish that Arkansas' midazolam protocol presents a substantial risk of serious harm. Under Glossip, the determination of whether a particular method of execution presents a substantial risk of serious harm

is a finding of fact, which we review under the deferential clear error standard. See Glossip, 135 S.Ct. at 2731 ("[T]he District Court did not commit clear error when it found that the prisoners failed to establish that Oklahoma's use of a massive dose of midazolam in its execution protocol entails a substantial risk of severe pain.").

The court asserts that the "equivocal nature of the evidence" fails to demonstrate that midazolam is sure or very likely to cause severe pain. But the clear-error standard "does not entitle us to overturn a finding 'simply because [we are] convinced that [we] would have decided the case differently.'" Id. at 2739 (alterations in original) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Rather, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. 1504. Thus, to the extent the court believes the evidence in this case is equivocal—a belief I disagree with—it is required to uphold the district court's findings.

Initially, the court concludes that the district court applied the incorrect legal standard. In its view, Glossip requires prisoners to show that a method of execution is "sure or very likely to cause serious illness and needless suffering." Though the district court quoted this language, the court believes that in fact the district court found only that the appellees showed the Arkansas' midazolam protocol presented an "objectively intolerable risk of severe pain." The distinction the court draws is not supported by Glossip. Glossip explains:

The controlling opinion in Baze first concluded that prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is " 'sure or very likely to cause serious illness and needless suffer-

ing,' and give rise to 'sufficiently imminent dangers.'" To prevail on such a claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"

Glossip, 135 S.Ct. at 2737 (citations and quotations omitted). As this paragraph demonstrates, the "sure or very likely to cause serious illness and needless suffering" standard is identical to the "objectively intolerable risk of harm" standard, as well as the "substantial risk of serious harm" standard. These are not different standards; they are different ways of describing the same standard. Indeed, all three phrasings are used interchangeably throughout both Glossip and Baze. See, e.g., id. at 2731, 2739, 2745; Baze, 553 U.S. at 50, 57, 128 S.Ct. 1520. My discussion will use the phrasing "substantial risk of serious harm."

In finding that Arkansas' midazolam protocol presents a substantial risk of serious harm, the district court engaged in a lengthy analysis of evidence presented over the course of a four-day hearing. The district court discussed in detail scientific studies, expert witness testimony, and anecdotal evidence regarding other executions conducted with midazolam. Ultimately, the district court concluded that both the scientific and anecdotal evidence was more consistent with the appellees' theory of the case. The state argues that the district court's finding was in error because it "ignores" various pieces of evidence that support the state's view that midazolam induces general anesthesia, because it erroneously relied on evidence regarding midazolam's "ceiling effect," and because anecdotal evidence of executions in other states was irrelevant. Thus, in the state's view, the district court relied only on "speculation, conjectures, and assumptions" in finding that Arkansas' midazolam protocol presents a substantial risk of severe harm.

### a. "Ignored" evidence

To begin with, the state points to several pieces of "undisputed" evidence that, it claims, the district court ignored in finding that midazolam presents a substantial risk of severe harm. First, the state contends the district court ignored evidence that the Food and Drug Administration's (FDA's) package insert for midazolam states that midazolam can be used to induce general anesthesia. On the contrary, the district court's order did discuss the insert, and did not find it to be persuasive evidence that midazolam alone can induce general anesthesia for two reasons. First, it noted that the insert "is not entirely internally consistent in its language, especially in regard to use of midazolam as an induction agent or as a sole agent for anesthesia." Indeed, as appellees' expert Dr. Craig Stevens pointed out, certain portions of the insert indicate that midazolam can be used to induce general anesthesia only when followed by "other anesthetic agents." He testified that this language was consistent with the usual practice of using midazolam together with other medications for induction of anesthesia. The district court also pointed out that the report of the state's expert witness, pharmacologist Dr. Daniel Buffington, explained that an FDA insert can be modified over time based on clinical uses, and that physicians sometimes use drugs "off-label," which the district court noted "seems to contradict a reliance on the label." Further, other evidence in the case consistently demonstrated that midazolam is effective to induce anesthesia only as one medication among several. One of the plaintiffs' experts, Dr. Jonathan Groner, testified that it is used as a "component" of anesthesia, and the appellees'

anesthesiology expert Dr. Joel Zivot testified that inducing anesthesia involves more than a single drug. Dr. Stevens and Dr. Groner also both testified that midazolam alone cannot induce general anesthesia. In light of the entire record, it cannot be said that the district court's well-reasoned decision to give limited weight to the FDA's package insert gave rise to clear error.

Next, the state contends that Dr. Zivot conceded midazolam can be used for induction of anesthesia and as the sole anesthetic for painful surgeries. The state misrepresents the testimony it cites. When asked if midazolam could be used for that purpose, Dr. Zivot testified, "[W]e could also just give them saline. I don't know what you're asking me. Could we? I mean, you can do a lot of things. So you could give it, but it would be insufficient." He also stated, "I could practice poor medicine in a number of ways, and that would be one of them." In short, Dr. Zivot's testimony does not indicate that he concedes midazolam would, by itself, induce general anesthesia. Additionally, as discussed above, several witnesses testified that midazolam cannot by itself induce general anesthesia. Dr. Groner also testified that midazolam is not an analgesic, meaning that it does not alleviate pain, and an authoritative textbook, Miller's Anesthesia, states that benzodiazepines (the class of drugs to which midazolam belongs) lack analgesic properties. Thus, the district court's failure to rely on Dr. Zivot's "concession" does not suggest that its finding that Arkansas' midazolam protocol presents a substantial risk of serious harm is clearly erroneous.

According to the state, the district court also ignored the fact Dr. Stevens co-authored a pharmacology textbook that listed anesthesia as one of the uses of midazolam. But again, the district court did not ignore this evidence: it acknowledged "that plain-tiffs' witness Dr. Stevens was cross examined effectively as to the table from the textbook he co-authored." However, it found that Dr. Stevens regained credibility in other portions of his testimony, in which he discussed the mechanism by which midazolam works to support his view that midazolam cannot, by itself, induce general anesthesia. Furthermore, Dr. Stevens explained that his textbook was a general introduction to pharmacology, which did not go into great detail, and pointed out that his textbook did not state midazolam could induce general anesthesia *by itself*. In light of these circumstances, the district court was justified in finding Dr. Stevens' detailed testimony regarding the mechanism by which midazolam functions credible despite his textbook's brief reference to its uses as an anesthetic. See Prince v. Sargent, 960 F.2d 720, 720–21 (8th Cir. 1992) (explaining that under clear-error review, "the appellate court should give particular deference to findings based upon credibility determinations").

The state also points out that its anesthesiology expert Dr. Joseph Antognini testified that a 20 to 30 milligram dose of midazolam will induce general anesthesia in a 200–pound man, that a 40 to 60 milligram dose will induce general anesthesia in a 400–pound man, and that a 500 milligram dose would be much more than necessary to anesthetize a person and render him insensate to pain. But, as the district court noted, there were several reasons not to fully credit Dr. Antognini's testimony on this point: some of the studies he relied on for his opinion that midazolam could induce general anesthesia by itself used a spinal injection rather than an IV to administer the midazolam; he could not recall if he had ever previously used midazolam as the sole agent to induce general anesthesia; and he gave an evasive answer to the question of whether midazolam can be used as the sole anesthetic even for

"short, painful" procedures. Given its estimation of Dr. Antognini's credibility, as well as other evidence in the record demonstrating that midazolam cannot induce general anesthesia by itself, the district court's rejection of Dr. Antognini's testimony did not give rise to clear error.

Finally, the state contends the district court ignored two studies that were discussed during the hearing. But the district court's opinion evaluated the studies at length, and found that both were "mixed in terms of supporting either side's theory of this case." In one study, researchers gave midazolam to 26 subjects and measured the depth of anesthesia achieved using bispectral analysis. Dr. Stevens testified that a bispectral analysis score between 40 and 60 indicates general anesthesia, and Dr. Buffington testified that a score of 60 is the industry definition of general anesthesia. As the district court noted in its order, only a few of the subjects in the study appear to have achieved a bispectral analysis score below 60. The district court was therefore justified in concluding the study did not lend great support to the state's theory. In the other study, researchers gave subjects doses of midazolam between 4.5 and 20 milligrams. According to the state, some of the subjects demonstrated bispectral analysis scores under 60, and "to the extent patient scores were above 60, Appellee's expert concedes these monitors often are not reliable." Even accepting the state's characterization of the study results, it is hard to see how it undermines the district court's conclusion that the study did not support either side's theory of the case. The fact that unreliable monitors may have shown that midazolam induced general anesthesia in some (but not all) subjects does not undercut the district court's finding that its use in Arkansas' execution protocol would create a substantial risk of severe harm by failing to properly anesthetize the inmates.

In short, the district court did not ignore the evidence the state cites; rather, it discussed each piece of it in detail and explained its reasons for finding the evidence supporting the appellees' case more persuasive. Though the state might have preferred the district court to resolve the conflicting evidence differently, this does not render the district court's finding that midazolam cannot by itself induce general anesthesia clearly erroneous.

### b. Ceiling effect

Next, the state contends that the district court erred in concluding that midazolam has a "ceiling effect." First, the state points out that Dr. Stevens' opinion as to the ceiling effect relied on data from *in vitro* and animal studies, rather than studies conducted on human subjects. The state conclusorily asserts this type of evidence is unreliable and violates Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). To the extent we may review the reliability of an expert opinion under Daubert at this stage, we do so under the abuse-of-discretion standard. See Glossip, 135 S.Ct. at 2745. The state cites no authority for the proposition that an expert's opinion is unreliable solely because it is based on *in vitro* or animal studies. In fact, Dr. Stevens pointed out that the FDA usually requires both types of studies in evaluating pharmaceuticals for human use. And, as the district court noted in its opinion, the state's own anesthesiology expert also cited an animal study. Furthermore, other evidence supported the district court's conclusion that midazolam has a ceiling effect. Dr. Antognini—who was a witness of the state— acknowledged that he had previously testified that midazolam had a ceiling effect, which he expected would occur at a dose of about 20 to 25 milligrams. As such, the district court's

conclusions regarding the ceiling effect support its finding that midazolam cannot by itself induce general anesthesia, and that finding was not clear error.

### c. Anecdotal evidence

Finally, the state argues that the district court should not have relied on anecdotal evidence of executions in other states, because those states used different execution protocols than Arkansas plans to use. In particular, the state notes that the execution of Clayton Lockett in Oklahoma failed not because of the midazolam used, but because his IV line dislodged. However, the district court specifically "recognize[d] that evidence of other executions using different lethal injection protocols has limited relevance to the Court's inquiry in this case." Thus, it considered the evidence only for the limited purpose of "assessing the scientific opinions offered by the parties' experts."

The district court concluded that the testimony of lay witnesses who had witnessed executions using midazolam was "more consistent with plaintiffs' theory of this case," especially with respect to "plaintiffs' arguments regarding the ceiling effect and articles about the synergistic effects on midazolam and opoids." It was not clear error for the district court to rely on the lay witness testimony for this limited purpose; nor does the fact that other states use different protocols significantly undermine the relevance of the lay testimony to demonstrate that midazolam is not by itself sufficient to induce general anesthesia.

The district court also considered Dr. Zivot's testimony regarding autopsies performed on inmates who had been executed in Florida using midazolam. Dr. Zivot testified that the autopsy reports showed death was not instantaneous, but occurred slowly, and would have caused the inmate to feel as though his lungs were filling with fluid. The district court acknowledged that unlike Arkansas' protocol, Florida's protocol requires the "very quick administration" of the paralytic drug after midazolam is administered. However, it noted that Dr. Zivot's description of the autopsy reports was not dissimilar to the lay witnesses' descriptions of executions where the paralytic drug was not administered as quickly. Thus, contrary to the state's assertions, the district court did not rely on anecdotal evidence of executions in other states without considering the differences in execution protocols. Rather, the district court recognized the "limited relevance" of the anecdotal evidence, and considered the possible effect different protocols might have had on the outcome of other executions. This evidence therefore does not undermine the district court's finding that midazolam presents a substantial risk of serious harm.

Accordingly, the district court did not clearly err in finding that the appellees demonstrated that Arkansas' midazolam protocol presents a substantial risk of serious harm. This conclusion is not inconsistent with the Supreme Court's holding in Glossip that the district court did not clearly err in finding that midazolam did *not* present a substantial risk of serious harm. The evidence and witnesses in this case differ from the evidence and witnesses before the district court in Glossip. More importantly, the clear-error standard itself contemplates that two courts may reach contrary conclusions without either having clearly erred. See Anderson, 470 U.S. at 574, 105 S.Ct. 1504 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

### 2. Alternative methods

The state also argues that the district court erred in finding that the appellees

established a likelihood of success on their midazolam claim because the appellees failed to identify "a known and available alternative[ ]" method of execution that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." Glossip, 135 S.Ct. at 2736–37 (quoting Baze, 553 U.S. at 52, 61, 128 S.Ct. 1520). Though it established the availability requirement, Glossip provided little guidance as to when an alternative method of execution is "available," and instead simply noted that the record demonstrated "that Oklahoma has been unable to procure t[he] drugs despite a good-faith effort to do so." Id. at 2738.

In its order granting the appellees' request for a preliminary injunction, the district court highlighted two interpretations of Glossip's availability requirement: the Eleventh Circuit's more demanding standard, articulated in Arthur v. Commissioner, Ala. Department of Corrections, 840 F.3d 1268 (11th Cir. 2016), cert. denied sub. nom., Arthur v. Dunn, —— U.S. ——, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017), and the Sixth Circuit's definition, announced in In re Ohio Execution Protocol, No. 17-3076, —— F.3d ——, 2017 WL 1457946 (6th Cir. 2017). Despite the fact that our court has yet to fully address what it means for an alternative method to be available under Glossip in the circumstances present here, the court adopts the Eleventh Circuit's iteration of the standard at the state's urging. But given the expedited timeline in the instant matter, I would decline to formally adopt an answer to this weighty legal question at this time. Instead, because I think that the appellees meet the more demanding standard articulated by the Eleventh Circuit, I assume for

purposes of this motion that the Eleventh Circuit's availability standard applies in this case.

In Arthur, the Eleventh Circuit affirmed the district court's denial of the plaintiff's motion for a preliminary injunction. It held that in order to establish a known available alternative method of execution, a plaintiff must establish that "(1) the State actually has access to the alternative; (2) the State is able to carry out the alternative method of execution relatively easily and reasonably quickly; and (3) the requested alternative would 'in fact significantly reduce [ ] a substantial risk of severe pain' relative to the State's intended method of execution." Arthur, 840 F.3d at 1300 (alteration in original) (quoting Glossip, 135 S.Ct. at 2737). Reviewing the district court's factual findings for clear error, see Glossip, 135 S.Ct. at 2738, I believe the facts as found by the district court establish known and available alternatives to midazolam.

The district court noted several potential alternative methods of execution, including, *inter alia*, manufactured or compounded pentobarbital (a barbiturate), and sevoflurane (a lethal gas).[2] First, the district court's findings support a conclusion that the appellees are likely able to demonstrate that the state "actually has access" to these alternatives. Arthur, 840 F.3d at 1300. With respect to manufactured or compounded pentobarbital, evidence established that other states currently utilize this drug in performing executions. For example, Missouri executed one person using FDA-approved manufactured pentobarbital as recently as January 31, 2017. Additionally, Texas and Georgia together have executed 20 people in 2016 and so far in 2017 using manufactured or compound-

---

2. The appellees also presented evidence of the state's ability to utilize a firing squad. In so doing, the appellees provided evidence that execution by firing squad may result in a faster death than execution by lethal injection, and that ADC employees receive some training in marksmanship.

ed pentobarbital. The state's expert, Dr. Buffington, testified that he believes Arkansas could acquire compounded pentobarbital for use in executions, though he could not identify a specific supplier—an unsurprising fact in light of Arkansas' laws securing anonymity for execution-drug suppliers. See In re Ohio Execution Protocol, No. 17-3076, —— F.3d ——, 2017 WL 1457946 (6th Cir. 2017) (considering similar testimony, also from Dr. Buffington, in finding that alternatives were available under different standard for "available"). These facts support a conclusion that the appellees are likely able to demonstrate that the state actually had access to a barbiturate.

Furthermore, the alleged defects the state highlights in appellees' proof of its ability to obtain pentobarbital—namely, that it does not currently have it on hand or have a supplier lined up—wane in the context of the appellees' evidence regarding sevoflurane. The appellees specifically identified by name one supplier willing to sell lethal gas to the ADC for use in executions. And the appellees presented evidence that lethal gas is available through online suppliers. Tr. 212–16; cf. Johnson v. Lombardi, 809 F.3d 388, 391 (8th Cir. 2015) (noting that, in the context of a motion to dismiss, a "threadbare assertion that lethal gas is *legally* available in Missouri is not the same as showing that the method is a feasible or readily implementable alterative method of execution." (emphasis in original)).

Glossip makes clear that a state's "good faith effort" to obtain an alternative may be relevant to determining whether an alternative is available. Glossip, 135 S.Ct. at 2738. The district court found that the state made little effort to obtain alternative execution drugs. Mr. Griffin, the current Deputy Director of Healthcare and Programs at the ADC, and ADC Director

Wendy Kelley are solely responsible for obtaining execution drugs. Arkansas law permits Director Kelley to choose execution drugs "approved by the [FDA] and made by a manufacturer approved by the [FDA]" or drugs "obtained by a compounding pharmacy that has been accredited by a national organization that accredits compounding pharmacies." Ark. Code Ann. 5-4-617(d). Director Kelley testified that she would prefer to use a barbiturate, but she explained she is not aware of any source from which she could obtain one. However, the last time Director Kelley attempted to obtain a barbiturate was after the Arkansas legislature amended the Arkansas MEA in 2015. Director Kelley asked three sources for a barbiturate, but all refused.

Likewise, Mr. Griffin has made no efforts to obtain a barbiturate since October 2015. In 2015, as a result of litigation in Arkansas state court, the Arkansas Attorney General provided Mr. Griffin with a list of drug manufacturers and their phone numbers in an effort to allow Mr. Griffin to investigate possible sources. While the district court was unclear about whether Mr. Griffin contacted anyone on the list, it found that Mr. Griffin did not hear back from or follow up with any company or individual identified on the list. Mr. Griffin has not talked to any compounding pharmacies about providing the ADC with execution drugs, and Mr. Griffin made clear that he has not attempted to acquire pentobarbital because he "ha[s] the drugs [he] need[s] to conduct the execution. So, no, [he hasn't] tried to get another one." Tr. P. 872. While the state's failure to make a good faith effort to procure alternative drugs is not determinative of their availability in isolation, see Arthur, 840 F.3d at 1303 (declining to impose an affirmative burden to make a good faith effort to obtain other execution drugs, and finding, in the alternative, that Alabama had made

such an effort by contacting 29 potential drug sources), these factual findings are not clearly erroneous and support the district court's conclusion that the appellees are likely able to establish that pentobarbital and lethal gas are available to the defendants. Glossip, 135 S.Ct. at 2738.

The district court's factual findings also support the conclusion that the appellees can likely prove that the state is able to perform executions using one of these alternative methods. Pentobarbital is utilized in the same manner as other lethal injection drugs, and therefore poses little problem with respect to the state's ability to use this alternative in a "relatively quick[ ] and easy[ ]" manner. Arthur, 840 F.3d at 1300. And, unlike execution by lethal injection, which requires some participants to have training in the placement and delivery of a drug by IV, medical expertise is not required to operate the equipment used to perform an execution by lethal gas. The equipment required to implement execution by lethal gas is relatively inexpensive, and is available for as little as $2,000. These factual findings are not clearly erroneous, and support the conclusion that the state could implement these alternatives with relative ease.

Finally, the district court cited ample evidence that barbiturates are a more effective sedative and would in fact significantly reduce the risk of harm posed by midazolam. As discussed above, the district court found that ample scientific and anecdotal evidence supported the conclusion that midazolam alone does not effectively induce general anesthesia. In contrast, the district court cited evidence that barbiturates like pentobarbital possess undisputed analgesic properties and may alone be an effective general anesthetic. The appellees presented evidence that they could likely establish that a barbiturate would adequately anesthetize them to the pain associated with the second and third drugs utilized in the Arkansas protocol.

The district court found that sevoflurane has the same mechanism action as barbiturate drugs and, like barbiturates, may cause death on its own. What's more, the district court noted the conclusion of the appellees' expert, Dr. Stevens, that sevoflurane and other lethal gases are more potent than barbiturates, and, in large doses, produce a "rapid and painless death." The fact that use of sevoflurane in executions is uncommon or novel does not preclude a finding that the appellees may prove this method significantly reduces their risk of suffering. As an aside, I note that Arkansas has also never performed an execution according to its current midazolam protocol. But, the frequency with which a method of execution has been utilized has no bearing on its viability. The Supreme Court made clear that a procedure's novelty does not render it violative of the Eighth Amendment; such a rule "would hamper the adoption of new and potentially more humane methods of execution and would prevent States from adapting to changes in the availability of suitable drugs." Glossip, 135 S.Ct. at 2745.

The district court's factual findings are not clearly erroneous, and those factual findings support a conclusion that the appellees have demonstrated "a likelihood that they can establish" that there are known and available alternatives to the state's use of midazolam. Glossip, 135 S.Ct. at 2737. Because the appellees presented evidence that they would likely be able to establish an alternative method of execution that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," Glossip, 135 S.Ct. at 2736–37 (quoting Baze, 553 U.S. at 52, 61, 128 S.Ct. 1520), I would affirm the district court's preliminary injunction

based on the appellees' Eighth Amendment midazolam claim.

## II. Combined Claim

The core of the appellees' complaint is not that Arkansas' use of midazolam, alone, supports the grant of preliminary injunction. It is the use of midazolam combined with the compressed execution schedule and insufficient execution procedures that present a novel set of circumstances. Eight of the appellees are scheduled to be executed over an eleven-day period beginning tonight. Two executions are set to occur back-to-back on four nights with the first execution at 7:00 pm and the second at 8:15 pm. The Governor scheduled the appellees' execution dates 49 days before the date set for the first execution. The only reason the state has given for its schedule is "to exhaust the State of Arkansas's supply of midazolam before it expires."

The two executions set for this evening will be the first executions Arkansas has carried out since 2005. The state's last double execution was in 1999. Neither Director Kelley nor Deputy Griffin has ever participated in an execution. Of the current ADC employees who testified, only Dale Reed, the Chief Deputy Director, has ever participated in an execution; even though he has presided over 23 executions, he has never participated in eight executions over eleven days. Tonight will mark the first time that Arkansas has carried out an execution using its midazolam protocol.

Since 1997, no state has attempted this many executions within a month. No state has conducted two executions within one day since 2000. In 2014, Oklahoma attempted a double execution of Clayton Lockett and Charles Warner. However, complications arose during Lockett's execution: he awoke during the administration

of the second and third drugs, and the execution was halted, but he died 40 minutes later. Warner's execution did not go forward that night. Oklahoma conducted an investigation into Lockett's execution which concluded that, going forward, "executions should be spaced at least seven days apart." Similarly, Missouri adopted a rule which limits executions to one per month.

The record supports the conclusion that a compressed execution schedule increases the stress on the prison administrators and staff. Oklahoma's investigation determined that the warden, paramedic, and all staff experienced "extra stress" because two executions had been carried out on the same day. Jennie Lancaster, a former North Carolina warden who supervised 23 executions during her career, testified that it would "essentially be professional malpractice" for Arkansas prison officials to carry out the executions as scheduled. She opined that each execution is "immensely stressful for everyone involved," equating it to the physical and mental stress of driving in torrential rain. After just one execution, staff involved in the executions experience "physical and mental fatigue" because they perform duties that require acute attention to detail and precise timing. Director Kelley agreed that there is stress inherent in the preparation of and events leading up to an execution. Lancaster testified that the stress and fatigue of performing eight executions over eleven days creates "a risk of human error."

Aside from the stress-related risks, Lancaster testified that the "logistical issues" of such a compressed schedule "present challenges that have never been experienced or planned for before." One of the logistical concerns is that with so many executions in such a short period there is insufficient time for the "essential" debriefing process, in which the staff

involved in an execution assess the process, correct deficiencies, receive remedial training, and air concerns about their own ability to conduct the next execution. Oklahoma recommended spacing out its executions in part to allow sufficient time for all involved personnel to discuss their concerns and recommendations for improving the process. The ADC Director before Kelley conducted mandatory debriefing sessions with all staff involved in the executions. Mr. Reed confirmed that given the abbreviated execution schedule, there would not be debriefings between the 7:00 pm and 8:15 pm executions on each of the four nights. Instead, there would only be one debriefing on the morning following the double executions.

Director Kelley also testified that her staff engages in "weeks of preparation" leading up to an execution. This preparation involves meetings with all the agencies and staff involved in the execution, during which the warden reviews each participant's role. Then, all of the staff involved in the execution would conduct approximately twelve practice sessions in which they simulated the entire execution process with a staff member of a similar stature standing in for the inmate. Because the executions are close together, Mr. Reed admitted that although the staff was conducting practices, it would not conduct twelve practice sessions for each of the eight men set to be executed.

The district court did not clearly err in finding that ADC officials were unsure of their roles and authority in the executions and they were not fully aware of all of the protocols. For example, less than a week before the first execution, Mr. Griffin was unaware when he would mix the execution drugs or that a pulse ox monitor would be used on the appellees. As of March 7, 2017, Mr. Reed had not seen the execution policy.

The district court also was not clearly erroneous in concluding that Arkansas does not have a contingency plan if something goes wrong during an execution. The testimony supports the district court's finding that the staff is not aware of a plan for if or when lifesaving techniques will be used or how they will be implemented if complications arise. At most, Director Kelley said if complications arose, she would close the curtain and call the Governor. Mr. Griffin said they had never rehearsed seeking medical treatment and was not aware whether medical staff would ever be called to assist. The ADC does not possess any drugs to reverse the effects of any of the three execution drugs, despite the fact that antidotes are available. Perhaps most concerning, Arkansas' midazolam protocol is silent on what happens if the appellees remain conscious after the two 500 mg injections of midazolam. Mr. Griffin testified that he is aware of no plans to reverse the effects of midazolam if an appellee remains conscious after the injections. Such contingency planning, including how to stop the execution and whether to provide life-saving measures, was similarly missing from Oklahoma's execution protocol prior to Lockett's execution, and Oklahoma recommended establishing protocols and training to address these possibilities. The record supports the district court's finding that if complications arise during any of appellees' executions, the ADC does not have a plan regarding whether to cancel or postpone any following executions.

### 1. Substantial Risk of Serious Harm

Based on these detailed factual findings, the district court did not clearly err in finding that appellees have demonstrated a significant possibility that they will succeed in showing that Arkansas' plan for executing them creates a "substantial risk of serious harm." Glossip, 135 S.Ct. at 2737

(quoting Baze, 553 U.S. at 50, 128 S.Ct. 1520). The district court relied on "numerous aspects of the protocol that ... create opportunities for error." Baze, 553 U.S. at 53, 128 S.Ct. 1520. The court also examined whether Arkansas was following its procedures in this case. Case law recognizes that opportunities for error and failure to follow established procedures "[s]ubject[ ] individuals to a risk of future harm—not simply actually inflicting pain—[and] can qualify as cruel and unusual punishment." Baze, 553 U.S. at 49, 128 S.Ct. 1520. Thus, it was not clearly erroneous for the district court to conclude that Arkansas' method of execution entails an "objectively intolerable risk of harm" where it relies on a drug—midazolam—that may not on its own produce sedation or relieve pain, intends to conduct four double executions within eleven days, has not performed an execution since 2005, and relies on an execution protocol and policies that do not contain adequate safeguards against complications that have occurred in other recent midazolam executions. Glossip, 135 S.Ct. at 2737; cf. id. at 2742 (finding no clear error in district court conclusion that "safeguards help to minimize any risk that might occur in the even that midazolam does not operate as intended").

The compounding risk for error identified by the district court distinguishes this claim from Glossip. The Glossip Court was not faced with a record of four back-to-back executions over eleven days, where the ADC had only 49 days to prepare. No state has attempted a similar schedule since capital punishment resumed in the United States in 1977. Cf. Baze, 553 U.S. at 53, 128 S.Ct. 1520 ("[I]t is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated."). The Glossip Court did not address the risk of harm when officials with limited execution experience intend to carry out eight executions with precise detail and timing at an unprecedented speed, using for the first time a drug with the potential to fail to induce sedation or to take away the severe pain caused by remaining two drugs. Cf. id. at 54, 128 S.Ct. 1520 (finding inadequate experience of employees irrelevant where trial court concluded the task was "[n]ot difficult at all" (alteration in original)); id. at 46, 128 S.Ct. 1520 (noting that the state executed another prisoner using the same lethal injections protocol without any reported problems). Nor was there any evidence in Glossip that the staff conducting the executions would be under a inordinate amount of stress beyond that inherent in any execution, would not have had time to conduct the usual practices and procedures they undertake before and after an execution, or would be acting without a contingency plan in case of complications during any one of the eight executions. Cf. id. at 55, 128 S.Ct. 1520 (finding IV line issues did not create a substantial risk of harm because the written protocol required IV team members to "participate in at least 10 practice sessions per year"); see Arthur v. Thomas, 674 F.3d 1257, 1263 (11th Cir. 2012) ("Significant deviations from a protocol that protects inmates from cruel and unusual punishment can violate the Eighth Amendment."). With the addition of these aggravating facts, this case presents a stronger case for concluding that appellees face a substantial risk of harm than that presented in Glossip or Baze.

### 2. Available Alternatives

Appellees also presented the court with evidence that there are alternatives to the condensed execution schedule and execution protocol. These alternatives satisfy the appellees' "burden of establishing that any risk of harm was substantial when compared to a known and available alternative method of execution." Glossip, 135 S.Ct. at

2738. Most obviously, Arkansas could reschedule the executions to allow more time between each one and to avoid scheduling multiple executions on a single day. This "known and available" alternative would permit more time for ADC officials to familiarize themselves with the execution protocol, to conduct a sufficient number of practice sessions for each appellee with a person of similar stature, to conduct debriefings after every execution, and to develop contingency plans in case midazolam does not have its desired effect. Spreading out the executions "effectively address[es]" the substantial risks of harm identified by the district court as to the expedited schedule and the execution protocol. Baze, 553 U.S. at 52, 128 S.Ct. 1520. The state does not seriously contest the appellees' contention that this alternative is "feasible" and "readily implemented." Id. The state's only response is that modifying the schedule past April 30 will "make it impossible for Arkansas to perform lawful executions because Arkansas' supply of midazolam ... expires into two weeks." Such an assertion is belied by the district court's well-supported findings, as discussed above, that there are several alternative methods the state could use to execute appellees. Where, as here, "a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." Baze, 553 U.S. at 52, 128 S.Ct. 1520.

In Baze, the petitioners proposed a one-drug protocol that no state had adopted, no evidence showed it was equally effective, and another state had rejected it. In contrast, here, the "comparative efficacy" of the elongated execution schedule is "well established." Id. at 57, 128 S.Ct. 1520. No other state has adopted a comparably compressed schedule put forth by the state in the last 50 years. Two states, in fact, have implemented recommendations that prevent multiple executions per day, or even multiple executions per week or per month. Moreover, the elongated schedule has the benefit of allowing additional time to develop contingency plans, conduct practice sessions, engage in debriefs, and educate all staff involved in the executions.

## III. Evolving Standards of Decency

The state's expedited execution schedule is troubling on a more fundamental level. As the Baze court noted, "throughout our history" "[o]ur society has [ ] steadily moved to more humane methods of carrying out capital punishment." 553 U.S. at 62, 128 S.Ct. 1520. The state's plan to execute eight men over an eleven day period, however, represents a step backward.

"By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." Roper v. Simmons, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). As explained by the Supreme Court:

The Eighth Amendment is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice. To enforce the Constitution's protection of human dignity, this Court looks to the evolving standards of decency that mark the progress of a maturing society. The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force.

Hall v. Florida, —— U.S. ——, 134 S.Ct. 1986, 1992, 188 L.Ed.2d 1007 (2014) (internal citations and quotations omitted). In determining whether the evolving standards of decency permit a practice, the court "should be informed by objective factors to the maximum possible extent," Atkins v. Virginia, 536 U.S. 304, 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (internal quotation omitted), including "legislative enactments and state practice with respect to executions," Roper, 543 U.S. at 563, 125 S.Ct. 1183. But, "objective evidence, though of great importance, [does] not 'wholly determine' the controversy, 'for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.' " Atkins, 536 U.S. at 312, 122 S.Ct. 2242 (quoting Coker v. Georgia, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)).

In the first part of the twentieth century, multiple executions per day and several per week were common. For example, in 1957, Georgia executed seven men over a fifteen day period in March, with two men executed on the fifteenth and three men on the nineteenth. Since at least 1977, there have been no similar clusters of executions conducted by any state. The last time eight executions were attempted within a month was in 1997. No state has conducted a double execution in a single day since 2000. See Kennedy, 554 U.S. at 433, 128 S.Ct. 2641 (relying on "[s]tatistics about the number of executions" to confirm whether a practice "is regarded as unacceptable in our society"). Moreover, the Supreme Court of Missouri has issued a rule limiting executions to one per month. Mo. Sup. Ct. R. 30.30(f). Likewise, Oklahoma's investigation following Lockett's execution recommended a maximum of one execution every seven days. From this objective evidence, under the "currently prevail[ing]"

standards, compressed execution schedules may violate the Eighth Amendment. Atkins, 536 U.S. at 311, 122 S.Ct. 2242. To permit the state to execute two men per night on four nights over an eleven day period "risks [the law's] sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." Kennedy v. Louisiana, 554 U.S. 407, 420, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), opinion modified on denial of reh'g, 554 U.S. 945, 129 S.Ct. 1, 171 L.Ed.2d 932 (2008).

Our "own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose" reinforces the constitutional violation revealed by the objective evidence. Id. at 421, 128 S.Ct. 2641. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." Atkins, 536 U.S. at 311, 122 S.Ct. 2242 (quotation omitted). Successive execution denies all involved the dignity to which he is entitled. Grouped together to face execution, the eight appellees are no longer treated as individuals in the criminal justice system. The dignity of prison administrators and the staff involved in the execution is also at stake. They are made to repeatedly suffer the stresses of the execution environment without the time for debriefing or reflection. With back-to-back executions set barely more than an hour apart, the family members of the victims, particularly those who wish to witness the execution, are denied the time to grieve and find closure in the viewing room. Finally, inflicting the penalty of death en masse risks eroding the public's trust in the judicial process and the fairness of the execution process. See Hall, 134 S.Ct. at 1993 (limiting the reach of the death penalty in part "to protect the integrity of the trial process").

The inmates, the state, and the public all have an interest in ensuring that these

sentences are not imposed in violation of the United States Constitution. The district court did not err in granting a preliminary injunction to achieve that goal.