WILSON, Circuit Judge,
concurring in judgment:
Arthur[1] is binding law in this circuit, and under that precedent, we must dismiss Anthony Boyd’s method-of-execution claim and ancillary due process claim. However, I dissented in Arthur and continue to believe it was wrongly decided. But for Arthur, I would reverse the district court’s dismissal of Boyd’s method-of-execution *878 and due process claims. I write separately to explain why, and to note that much of the Majority opinion is dicta with which I disagree.
1. METHOD-OF-EXECUTION CLAIM
The Majority affirms the dismissal of Boyd’s method-of-execution claim based on the finding that Boyd has not sufficiently alleged an execution alternative. Boyd proposes death by firing squad as an execution alternative, but the Majority correctly determines that, under Arthur, § 15-18-82.1 of the Alabama Code precludes Boyd from relying on the firing squad as an alternative.[2] The Majority however does not end its analysis of Boyd’s method-of-execution claim with Arthurs dispositive finding—it continues to discuss the claim for several pages. See Maj. Op. at 867-72. That unnecessary discussion of the claim is non-binding dicta. See Pretka v. Kolter City Plaza II, Inc., 608 F.3d 744, 762 (11th Cir. 2010) (stating that dicta is language in an opinion “not necessary to the decision”); Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) (“[Djicta is not binding on anyone for any purpose.”). And in that dicta the Majority suggests that Boyd’s claim fails not only because of § 15-18-82.1 but also because Boyd’s allegations are insufficient to support a finding that the firing squad is a practicable execution alternative in Alabama.
As I discussed in my Arthur dissent, I do not believe that § 15-18-82.1 precludes claimants like Boyd from relying on death by firing squad. Arthur, 840 F.3d at 1321-33 (Wilson, J., dissenting). Also, I disagree with the Majority’s suggestion that Boyd’s allegations about the firing squad are insufficient. But for Arthur, I would allow Boyd to proceed to discovery on his method-of-execution claim.
A. Arthur was wrongly decided.
In concluding that § 15-18-82.1 forecloses method-of-execution claims that rely on death by firing squad as an execution alternative, our decision in Arthur promulgated a startling holding: that state legislation can thwart constitutional claims for relief from cruel and unusual punishment. See id. at 1327-28. In my view, that holding is deeply flawed and Arthur was wrongly decided. But rather than revisit why I believe the holding is flawed, I defer to my Arthur dissent and limit my discussion to developments subsequent to Arthur that further lament the holding. In the short time since Arthur was decided, two Supreme Court justices have expressed reservations about the holding; a court of appeals judge has penned a concurrence that highlights the tension between the holding and the Eighth Amendment; a district court judge has disagreed with the holding; and at least one circuit court has departed from the holding, creating a circuit split.
Justice Sotomayor, joined by Justice Breyer, dissented to the denial of certiora-ri in Arthur, and in the dissent, the Justices voiced serious concerns about this court’s holding in the case. Our decision in Arthur, the Justices found, “contradicts the very decisions it purports to follow— Baze and Glossip”;[3] violates the Supremacy Clause “by conditioning federal constitutional rights on the operation of state statutes”; and risks inconsistent application of the Constitution since, under the decision, whether a prisoner can obtain *879 method-of-execution relief “depends not on the Constitution but on vagaries of state law.” See Arthur II, 137 S.Ct. at 729-30 (Sotomayor, J., joined by Breyer, J., dissenting from denial of certiorari). What’s more, the Justices found that the Arthur holding jeopardizes the “ongoing national conversation ... around the methods of execution the [Eighth Amendment] tolerates.” Id. at 731. That constitutionally required conversation takes place through a dialectic exchange between courts and legislatures in which courts examine evolving standards of decency and apply those standards to state-execution practices. See id. at 731-33. The Justices determined that Arthur, by finding that state legislation can thwart method-of-execution claims, empowers states to “silence” that conversation. See id.
Shortly after certiorari was denied in Arthur, Judge Stranch of the Sixth Circuit Court of Appeals cited Justice Sotomayor and Justice Breyer’s dissent in a concurrence that calls attention to the tension between our holding in Arthur and the Eighth Amendment. See In re Ohio Execution Protocol, 853 F.3d 822, 846-47 (6th Cir.) (Stranch, J., concurring), vacated for reh’g en banc, 855 F.3d 702, 2017 WL 1457946 (6th Cir. Apr. 25 2017). The concurrence highlights the constitutional dilemma posed by a holding like Arthurs that allows states to muzzle the national conversation about the death penalty.
Judge Stranch stressed that the Eighth Amendment requires “a continuing dialogue” between courts, legislatures, and the American people “on the meaning of the Amendment’s prohibition on cruel and unusual punishments.” See id. “[T]he meaning of th[e] prohibition is derived from the evolving standards of decency that mark the progress of a maturing society,” and without a continuing dialogue, courts cannot fulfill their duty under the Eighth Amendment to identify, clarify, and enforce those standards. See id. (internal quotation marks omitted).
Pointing to recent developments in our society that bear on the death penalty and evolving standards of decency, Judge Stranch deftly illustrated this point. Judge Stranch noted that countless drug companies in recent years have refused “to sell execution drugs” and that this development may evidence “changing societal attitudes toward the death penalty and a conclusion ... that the business in which drug companies engage, selling drugs that improve health and preserve life, is not consistent with selling drugs that are used to put people to death.” Id. at 846. She also noted that a “2015 survey found that a majority of Americans prefer life without parole over the death penalty for people convicted of murder” and that the survey “matches polling in 2016 finding that public support for the death penalty has dropped below 50%, to its lowest level in 45 years.” Id. at 847. Absent a continuing dialogue among courts, legislatures, and the American people that takes into account these types of developments, our jurisprudence and state-execution practices would inevitably become divorced from evolving standards of decency. See Graham v. Florida, 560 U.S. 48, 82, 130 S.Ct. 2011, 2036, 176 L.Ed.2d 825 (2010) (Stevens, J., concurring) (“Society changes. Knowledge accumulates. We learn, sometimes, from our mistakes. Punishments that did not seem cruel and unusual at one time may, in the light of reason and experience, be found cruel and unusual at a later time.... ”).
Following Judge Stranch’s concurrence, Judge Baker of the District Court for the Eastern District of Arkansas issued an order further calling into question our court’s holding in Arthur. In granting a preliminary injunction to halt a series of *880 Arkansas executions, Judge Baker disagreed with the holding. McGehee v. Hutchinson, No. 17-00179, slip op. at 80, 2017 WL 1399554 (E.D. Ark.), vacated on other grounds by McGehee v. Hutchinson (McGehee II), 854 F.3d 488 (8th Cir.) (en banc), cert. denied, 581 U.S. -, 137 S.Ct. 1275, 197 L.Ed.2d 746 (2017). She found “that the Eleventh Circuit’s limitation [in Arthur] of alternative methods [of execution] to those presently permitted under state law finds no textual basis in Baze or Glossip.” See id.
Although the Eighth Circuit Court of Appeals, sitting en banc, vacated Judge Baker’s preliminary injunction, it agreed with Judge Baker’s departure from the Arthur holding: “[W]e disagree with the legal standard that the district court applied in determining whether alternative methods of execution are known and available. [However, w]e do not say that an alternative method must be authorized by statute or ready to use immediately....” See McGehee II, 854 F.3d at 493.
These critiques of our decision in Arthur underscore its serious flaws. I suspect that as time passes the body of jurisprudence casting doubt on Arthur will only continue to grow.
B. Boyd’s allegations are sufficient.
Boyd is entitled to proceed to discovery if his complaint includes allegations sufficient to support a reasonable inference that death by firing squad (1) is “feasible [and] readily implemented” and (2) “significantly reduces a substantial risk of severe pain.” See Glossip, 135 S.Ct. at 2737 (internal quotation marks omitted); Baze, 553 U.S. at 52, 128 S.Ct. at 1532 (plurality opinion); Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In considering whether Boyd’s allegations satisfy these requirements, we must accept the allegations as true. See Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949. We must also “draw on [our] judicial experience and common sense” and take into account the specific “context” surrounding the firing squad. See id. at 679, 129 S.Ct. at 1950; Roe v. Michelin N. Am,., Inc., 613 F.3d 1058, 1062 n.5 (11th Cir. 2010) (“[A] district court must examine a claim’s context and draw on the court’s judicial experience and common sense, when evaluating whether a complaint sufficiently pleads a claim.... ” (internal quotation marks omitted) (emphasis in original)).
Boyd alleges:
Both Utah and Oklahoma use or could use the firing squad, which makes it a known alternative. Use of a firing squad based on an existing protocol from one of these states is “available” because there are no impediments to obtaining the required materials, as there may be for lethal injection drugs. [Alabama] h[as] represented that [certain alternative lethal injection drugs] are not “available,” and the same cannot be said for the materials required for a firing squad execution. For instance, Utah’s protocol contemplates five trained shooters, four of whose guns are loaded and the fifth loaded with a non-lethal wax bullet. Both of these other states evaluated and approved the firing squad as a method of execution through the legislative process, as states, including [Alabama] are fully capable of doing. Use of a firing squad, a known and available alternative based on one of these other states’ protocols, would entail a lesser risk of pain than the substantial risk of severe pain Mr. Boyd faces under Alabama’s existing protocol. This is so even though firing squad execution—while more unpleasant to observe than lethal injections, and while described as “barbaric”—are viewed as having a record of relative speed and certainty for the con *881 demned, whose constitutional rights are actually at stake.
If we set aside Arthur, these allegations—viewed through the lens of judicial experience, common sense, and the context surrounding death by firing squad—are sufficient to support a “reasonable inference” that the firing squad satisfies the requirements of Baze and Glossip. See Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949.
1. Boyd’s allegations support a reasonable inference that the firing squad is feasible and readily implemented.
The context specific to death by firing squad provides an important backdrop for our analysis of whether Boyd has sufficiently alleged that the firing squad is feasible and readily implemented. See id. at 679, 129 S.Ct. at 1950; Roe, 613 F.3d at 1062 n.5. “[Djrawing on our judicial experience and common sense,” Iqbal, 556 U.S. at 679, 129 S.Ct. at 1950, we know that the firing squad is a straightforward, well-known procedure that has been performed for centuries, see Baze, 553 U.S. at 42, 48, 128 S.Ct. at 1526, 1530; Glossip, 135 S.Ct. at 2732, 2739; Wilkerson v. Utah, 99 U.S. 130, 134-36, 25 L.Ed. 345 (1878) (holding that death by firing squad is constitutional and noting that in the nineteenth century the military “commonly” used the firing squad); Guardian News & Media LLC v. Ryan, 225 F.Supp.3d 859, No. 14-02363, slip op. at 18, 2016 WL 7385036 (D. Ariz. Dec. 21, 2016) (referring to the firing squad as a “still-used historical execution technique! ]”). We also know that the materials necessary for the firing squad— guns and bullets—are abundant. Finally, we know that Alabama has ready access to guns, bullets, and personnel who are trained in firearms because Alabama is a modern militarized state with a national guard, a department of corrections, and a police force.
Considering this context and taking Boyd’s allegations as true, the allegations support a reasonable inference that death by firing squad is “known and available,” which means the allegations support a reasonable inference that the firing squad is feasible and readily implemented. See Baze, 553 U.S. at 61, 128 S.Ct. at 1537 (equating “feasible and readily implemented” with “known and available” when articulating the standard for method-of-execution claims); Glossip, 135 S.Ct. at 2737-38 (same).
First, the firing squad itself, the possible procedures for administering the firing squad, and the materials and personnel needed to perform the firing squad are clearly “known.” The long history of the firing squad and the straightforward process for implementing the firing squad compel this conclusion.
Second, Boyd’s allegations make plausible his claim that the firing squad is available to Alabama. Boyd alleges that Utah and Oklahoma use or could use the firing squad[4] and that no impediments exist to Alabama employing the firing squad in a manner similar to those states’. Given that Alabama, like Utah and Oklahoma, is a modern militarized state with the death penalty, that allegation is plausible. See Wood v. Ryan, 759 F.3d 1076, 1103 (9th Cir.) (Kozinski, J:, dissenting from denial of rehearing en banc) (“There are plenty of people employed by [a] state who can pull the trigger [for a firing-squad execution] and have the training to aim true. [And t]he weapons and ammunition are bought by the state in massive quantities for law *882 enforcement purposes.”), vacated, — U.S. -, 135 S.Ct. 21, 189 L.Ed.2d 878 (2014). A conclusion to the contrary would strain credulity. Firing-squad executions were carried out in this country as early as the nineteenth century. See Wilkerson, 99 U.S. at 134-36. Surely Alabama has the capacity in the age of drones and space travel to assemble a firing squad, especially considering that Alabama could look to Utah and Oklahoma for assistance. See Watts v. State of Ind., 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949) (plurality opinion) (“[T]his Court should not be ignorant as judges of what we know as men.”). Indeed, Alabama has been able to assemble the equipment, personnel, and protocols needed for lethal injection—a much more complicated procedure than the firing squad.
2. Boyd’s allegations support a reasonable inference that the firing squad significantly reduces a substantial risk of severe pain.
Boyd extensively alleges that Alabama’s current execution method—lethal injection using midazolam—poses a substantial risk of severe pain, and Alabama does not dispute the sufficiency of those allegations.[5] Accordingly, if Boyd has sufficiently alleged that death by firing squad does not involve such a risk, his allegations support a finding that the firing squad significantly reduces a substantial risk of severe pain. He has done exactly that.
Boyd pleads that death by firing squad poses minimal risk of pain because it is a certain, speedy method of execution. Taking into account judicial experience and common sense, that allegation is plausible. The Supreme Court has remarked that “there is some reason to think that [the firing squad] is relatively quick and painless.” See Glossip, 135 S.Ct. at 2739 (internal quotation marks omitted); id. at 2797 (Sotomayor, J., dissenting) (“[F]rom a condemned inmate’s perspective, ... [the] relatively painless violence [of death by firing squad] may be vastly preferable to an excruciatingly painful death hidden behind a veneer of [lethal injection drugs.]”). Similarly, Judge Kozinski of the Ninth Circuit Court of Appeals has recognized that a firing-squad execution limits a prisoner’s risk of pain. See Wood, 759 F.3d at 1103 (Kozinski, J., dissenting from denial of rehearing en banc) (“The firing squad strikes me as the most promising [method of execution] .... [L]arge-caliber rifle bullets fired at close range can inflict massive damage, causing instant death every time.”).[6]
II. DUE PROCESS CLAIM
The Majority also dismisses Boyd’s due process claim, finding that the claim is *883 time barred. See Maj. Op. at 875-76. I do not believe the claim is time barred, but I agree with the Majority’s ultimate determination that the claim is subject to dismissal.
Because Boyd’s method-of-execution claim is timely, see id. at 859, so is his due process claim. The same two-year limitations period governs both claims, and the claims accrued at the same time. Boyd argues that the secrecy surrounding Alabama’s execution protocol violates his due process rights because the secrecy denies him a fair opportunity to pursue his method-of-execution claim. Boyd’s due process claim is therefore ancillary to his method-of-execution claim,[7] and it did not accrue until the method-of-execution claim accrued. Boyd’s due process right to be afforded “an opportunity ... to substantiate [his method-of-execution] claim before it is rejected” could not have been infringed before his method-of-execution claim even arose. See Ford v. Wainwright, 477 U.S. 399, 414, 106 S.Ct. 2595, 2604, 91 L.Ed.2d 335 (1986) (plurality opinion) (internal quotation marks omitted).
Even so, we must dismiss Boyd’s due process claim since it is ancillary to, and thus shares the fate of, his method-of-execution claim.
III. CONCLUSION
Although Arthur compels us to affirm the dismissal of Anthony Boyd’s method-of-execution and due process claims, I continue to believe Arthur was wrongly decided. This case highlights the tension between that decision and the Eighth Amendment. Boyd faces a controversial method of execution—midazolam-based lethal injection—that has resulted in botched and inhumane executions, and he has identified a viable execution alternative. Yet because of Arthur, Boyd cannot even access discovery.
I concur in the result only.

. Arthur v. Comm’r, Ala. Dept. of Corrs., 840 F.3d 1268 (11th Cir. 2016), cert. denied sub nom. Arthur v. Dunn (Arthur II), 580 U.S. -, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017).

. Boyd relies on hanging as another execution alternative, but Arthur forecloses that alternative as well.

. Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); Glossip v. Gross, 576 U.S. -, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015).

. Bolstering this allegation, Utah successfully carried out a firing-squad execution as recently as 2010—a fact of which judicial notice can be taken at this stage in the proceedings. See Fed. R. Evid. 201(b), (d).

. Alabama would likely have difficulty challenging Boyd's allegations given that “[s]cience and experience are now revealing that, at least with respect to midazolam-centered protocols, prisoners executed by lethal injection are suffering horrifying deaths....” See Arthur II, 137 S.Ct. at 733 (Sotomayor, J., joined by Breyer, J., dissenting from denial of certiorari).

. Moreover, a number of scholars have opined that states should turn to death by firing squad because, among other things, it is a relatively quick and painless method of execution. See, e.g., Deborah W. Denno, The Firing Squad As "A Known and Available Alternative Method of Execution” Post-Glossip, 49 U. Mich. J. L. Reform 749, 792-93 (2016); Alexander Vey, Note, No Clean Hands in A Dirty Business: Firing Squads and the Euphemism of "Evolving Standards of Decency”, 69 Vand. L. Rev. 545, 575-78 (2016); Kristen Loveland, Note, Death and Its Dignities, 91 N.Y.U. L. Rev. 1279, 1313 (2016); P. Thomas Distanislao, III, Note, A Shot in the Dark: Why Virginia Should Adopt the Firing Squad As Its Primary Method of Execution, 49 U. Rich. L. Rev. 779, 805 (2015).

. Citing Wellons v. Commissioner, Georgia Department of Corrections, 754 F.3d 1260 (11th Cir. 2014) (per curiam), and Jones v. Commissioner, Georgia Department of Corrections, 811 F.3d 1288 (11th Cir. 2016), the Majority suggests that Boyd has not stated a valid due process claim because a prisoner does not have a standalone right to know the details of his state’s method of execution. See Maj. Op. at 876 n.4. However, Boyd’s due process claim includes allegations that Alabama’s “secrecy policy” infringes his opportunity to litigate his method-of-execution claim. The claim is not based on a standalone right to execution-related information; the claim is ancillary to Boyd’s method-of-execution claim and implicates established due process rights. The "elementary rights of men” require "fairness” and "[a]n opportunity to be heard.” See Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170-71, 71 S.Ct. 624, 647-48, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). When a state policy impairs a prisoner’s opportunity to litigate a constitutional claim, the prisoner can challenge the policy as part of his constitutional claim. See id. Neither Wellons nor Jones forecloses this type of ancillary due process claim.