# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1301
_____

Euclid Market Inc.

*Plaintiff - Appellant*

v.

United States of America, through its Agency,
the United States Department of Agriculture

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri

_____

Submitted: September 20, 2022
Filed: February 16, 2023

_____

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

The United States Department of Agriculture ("USDA") permanently disqualified Euclid Market Inc. ("Euclid Market"), from the Supplemental Nutrition Assistance Program ("SNAP") after it determined Euclid Market had unlawfully trafficked SNAP benefits. After the USDA issued its final decision, Euclid Market filed this action in federal court under 7 U.S.C. § 2023, requesting the district court set aside the USDA's final decision. Following a two-day trial, the district court

found Euclid Market did not meet its burden to show the USDA's action was invalid and entered judgment in favor of the government. Euclid Market appeals. We vacate the judgment and remand for further proceedings.

## I. Background

## A. SNAP Overview

SNAP began with the enactment of the Food Stamp Act of 1964. *See* Pub. L. 88-525, Aug. 31, 1964, 78 Stat. 703. In 2008, Congress renamed it the Food and Nutrition Act of 2008 and began referring to distributions as SNAP, rather than food stamps. *See* Pub. L. 110-234, Title IV, § 4001, May 22, 2008, 122 Stat. 923. The program focuses on assisting low-income households to meet their basic food and nutrition needs. *See* 7 U.S.C. § 2011; 7 C.F.R. § 271.1. The USDA, Food and Nutrition Service facilitates SNAP. For simplicity, we refer generally to the USDA.

Recipients access the funds via Electronic Benefit Transfer Cards that operate similarly to debit cards. *See* 7 U.S.C. § 2016; 7 C.F.R. § 274.1; *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 375 (1st Cir. 2018). SNAP-authorized stores have a point-of-sale device that electronically transfers funds from the individual's SNAP account to the store when an individual purchases an item. 7 C.F.R. § 274.1(b).

SNAP benefits may only be used to purchase certain kinds of food. *See* 7 U.S.C. § 2012(k) (defining "food" for purposes of SNAP); 7 U.S.C. § 2013(a) ("The benefits so received by such households shall be used only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program."). The Code of Federal Regulations defines "[e]ligible foods" as including "[a]ny food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared

for immediate consumption . . . ."[1]  7 C.F.R. § 271.2.  But the regulation permits the purchase of "[s]eeds and plants to grow foods for the personal consumption of eligible households" and meals prepared by certain qualified facilities that serve prepared food to the homeless, elderly, disabled, drug addicted, or to battered women, just to name a few.  *See id.*

Exchanging SNAP benefits for anything not SNAP-eligible is considered one form of "trafficking."  *See id.*  The government estimates that, on average, approximately $1.27 billion in SNAP distributions were trafficked each year between 2015 and 2017.[2]  The government has dedicated resources to prevent trafficking.  In 2014, Congress passed the Agricultural Act of 2014, Pub. L. 113-79, Title IV, § 4029, 128 Stat. 649, 813 (codified at 7 U.S.C. § 2036b), which authorized $5,000,000 to be appropriated annually from 2014 through 2018 to prevent SNAP trafficking.  Congress extended the appropriation through 2023 in the Agricultural Improvement Act of 2018, Pub. L. 115-334, Title IV, § 4020, Dec. 20, 2018, 132 Stat. 4490, 4652 (codified at 7 U.S.C. § 2036b).  And Congress has afforded little tolerance for stores who traffic in SNAP.  With certain exceptions, if the USDA finds a store has committed even one trafficking transaction, the statute states the store "shall be" permanently disqualified from participating in SNAP.  7 U.S.C. § 2021(b)(3)(B).

One way the USDA combats trafficking is by analyzing store data of SNAP transactions through the Anti-Fraud Locator Utilizing Retailer Electronic Transactions ("ALERT") program.  ALERT scans all Electronic Benefit Transfer

---

[1]We have not identified an official definition of "hot food."  Testimony at trial in this case from Fredrick Conn, a section chief with the USDA Food and Nutrition Service, was that hot foods are generally foods like those purchased at a restaurant; they are ready to eat at the time of purchase.

[2]*See* USDA, *The Extent of Trafficking in SNAP: 2015-2017*, Food & Nutrition Serv., https://www.fns.usda.gov/snap/extent-trafficking-2015-2017 (last updated Sept. 3, 2021).

("EBT") purchases made each month by SNAP-participating stores and identifies suspicious patterns. The USDA uses ALERT to generate a "watchlist." The USDA then screens stores that appear on the watchlist and determines whether or not further investigation is needed. If more investigation is needed, the case is sent to a section chief, who assigns a program specialist to review the case.

The USDA may arrange for an independent contractor to visit the store and conduct an onsite investigation. The program specialist makes a recommendation to the section chief based on the onsite investigation and other relevant data and information. If the program specialist recommends further action against the store, the section chief reviews the recommendation and results for accuracy and then may issue a charging letter detailing the allegations to the store. The charging letter gives the store an opportunity to respond with information, explanation, or evidence. *See* 7 C.F.R. § 278.6(b). After the store responds, the USDA makes its determination. *See id.* § 278.6(c). The store can seek administrative review and appeal the USDA's determination. *See id.* § 279.1. If the store loses on appeal, it can file a complaint in court challenging the validity of the USDA's decision. *See* 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7(a).

### B. The USDA Disqualifies Euclid Market

The USDA analyzed ALERT data of Euclid Market's SNAP transactions from April 2018 through September 2018. It identified three suspicious patterns of activity: (1) a large number of transactions that ended in the same cents value—eighteen transactions ending in .98; (2) transactions made from individual benefit accounts in a set period—fifty-six flagged transactions comprising twenty-seven "transaction sets"; and (3) transactions that were large based on the store's alleged characteristics—eighty transactions ranging from $70.28 to $335.70. The case was handled by Section Chief Fredrick Conn and Program Specialist Paul Arce. Rick Steen performed the onsite inspection of Euclid Market.

Arce ultimately recommended to Conn that Euclid Market be disqualified. Conn then sent Euclid Market a letter on behalf of the USDA charging Euclid Market with trafficking. Euclid Market responded and disputed the USDA's trafficking charge. In the response, it included photos of its SNAP-eligible food and receipts from some of the allegedly suspicious transactions. The USDA reviewed the explanations but concluded the violations cited in its charging letter occurred and disqualified Euclid Market from participating in the SNAP program. Euclid Market pursued an administrative appeal, but the USDA affirmed its prior decision and issued its Final Agency Decision in July 2019.

## C. District Court Proceedings

Euclid Market filed a complaint against the United States to challenge the validity of the USDA decision. The United States moved for summary judgment. The district court denied the motion and later set the case for trial. Following the trial, the district court issued its Memorandum Opinion in favor of the USDA and against Euclid Market. *See Euclid Mkt. Inc. v. United States*, No. 4:19-cv-02136-MTS, 2021 WL 5905962 (E.D. Mo. Dec. 14, 2021). The district court held Euclid Market did not prove that its conduct was lawful or that the USDA's permanent disqualification of Euclid Market from the program was invalid.

The district court began its analysis by recognizing its review of the case under 7 U.S.C. § 2023 was a "trial de novo," in which the court is to "make an independent determination of the issues." *Id.* at *5 (quoting *Ghattas v. United States*, 40 F.3d 281, 286 (8th Cir. 1994)). The district court stated: "Since even a single instance of trafficking warrants permanent disqualification, the disqualified retailer must prove that *every* trafficking transaction the USDA raised was legitimate." *Id.*

The district court concluded the store "failed to meet its difficult burden of demonstrating that *every* transaction that the USDA showed was likely trafficking actually was a legitimate transaction." *Id.* Regarding the transactions for which Euclid Market did not have receipts, the district court found "the Market had no

-5-

evidence supporting the legitimacy of the transactions whatsoever" based on the absence of receipts. *Id.* It dismissed Euclid Market's "general explanations that likely may explain *some* of the transactions" because "general explanations do not suffice to demonstrate every transaction was legitimate." *Id.* "Thus, without cash register receipts, or any other evidence surrounding those specific transactions, the Market did not establish these 59 transactions' legitimacy," the district court concluded. *Id.*

As for the transactions for which Euclid Market produced receipts, the district court found "the receipts offer[ed] little" because they were not itemized. *Id.* at *6. In the district court's view, the lack of itemization combined with the fact Euclid Market did not have a price list to which the receipts could be compared, meant the receipts were ineffective at rebutting USDA's trafficking claim for the related transactions. *See id.*

In a footnote, the district court noted "substantial evidence support[ed] the Agency's trafficking finding." *Id.* at n.4. The district court observed, "[Euclid] Market's EBT date [sic], high ALERT rankings, and Scan Flag Comparison to similar stores alone raise serious suspicion, especially when considered with the Agency's analysis of SNAP beneficiary households' shopping patterns." *Id.* The district court also noted certain USDA evidence casting doubt as to whether Euclid Market had purchased sufficient SNAP-eligible inventory to support the quantity of SNAP transactions Euclid Market conducted. *See id.*

## II. Analysis

On appeal, Euclid Market argues the district court's decision suffered from two legal errors: (1) the district court should have placed the burden of proof on the USDA; and (2) even if the district court correctly placed the burden of proof on Euclid Market, the district court distorted the burden by requiring Euclid Market to produce transaction-specific evidence for each transaction raised by the USDA. We address these arguments in turn.

## A. Burden of Proof

Euclid Market first argues the district court should have placed the burden of proof on the USDA. "Proper allocation of the burden of proof is . . . a legal issue subject to *de novo* review." *D. L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1062 (8th Cir. 2020).

The Supreme Court has stated that when courts "are determining the burden of proof under a statutory cause of action, the touchstone of [the] inquiry is, of course, the statute." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). However, the plain text of 7 U.S.C. § 2023, is silent on who bears the burden of proof when a store challenges the USDA's decision in court. Thus, we turn to the "ordinary default rule." *Id.* And the default rule is that "plaintiffs bear the risk of failing to prove their claims." *Id.* "Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." *Id.* at 57–58.

Five of our sister circuits have held that the party challenging the USDA's decision bears the burden of proof. *See Irobe*, 890 F.3d at 378; *Fells v. United States*, 627 F.3d 1250, 1253 (7th Cir. 2010); *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991); *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir. 1986); *Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir. 1975). In addition, in an unpublished, and therefore non-binding, decision, we found the reasoning of *Redmond* persuasive and affirmed a district court's decision to place the burden of proof on the plaintiff in this context. *See Haynes v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 106 F.3d 405 (Table), 1997 WL 31600, at *1 (8th Cir. 1997) (unpublished per curiam).

The only reason Euclid Market provides on appeal for rejecting the default rule is that the USDA should bear the burden of proof because the district court's proceeding under 7 U.S.C. § 2023 is a trial de novo and the USDA is the party alleging that the store violated SNAP regulations. If Euclid Market is suggesting

that the party who "seeks to change the present state of affairs . . . naturally should be expected to bear the risk of failure of proof or persuasion," we generally agree. *Weast*, 546 U.S. at 56 (quoting J. Strong, McCormick on Evidence § 337, p. 412 (5th ed. 1999)). We disagree, however, that the USDA is the party seeking change. The statute requires the store to file a complaint against the United States "requesting the court to set aside" the USDA's determination. 7 U.S.C. § 2023(a)(13). In this way, it is the store who seeks the departure from the status quo. At the time the complaint is filed, the store has been disqualified from SNAP, and it seeks to change that fact by convincing the district court the USDA's decision was invalid. *See id.* § 2023(a)(15). To the extent that Euclid Market's argument suggests the trial-de-novo standard of review requires the USDA to bear the burden of proof, again we disagree. This line of reasoning would conflate the standard of review with the burden of proof, which are "entirely unrelated concepts . . . ." *Concrete Pipe & Prod. of Cal. v. Const. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 650–51 (1993) (Thomas, J., dissenting) (citing majority opinion at 622–23).

Euclid Market has not offered a compelling reason to depart from the default rule that "plaintiffs bear the risk of failing to prove their claims." *Weast*, 546 U.S. at 56. Thus, in this instance, Euclid Market should bear the burden of proof.[3]

---

[3]Euclid Market's argument highlights its dissatisfaction with the fairness of the process. But Euclid Market did not argue that placing the burden of proof on the store violates its due process rights. *C.f. Benavidez v. City of Albuquerque*, 101 F.3d 620, 625–28 (10th Cir. 1996) (analyzing whether placing the burden of proof on employees in post-termination administrative hearings violated the Fourteenth Amendment and applying the test found in *Mathews v. Eldridge*, 424 U.S. 319 (1976)). While a number of our sister circuits have stated the trial-de-novo standard effectively guarantees stores' procedural due process rights are not violated, *see Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997); *TRM, Inc. v. United States*, 52 F.3d 941, 944 (11th Cir. 1995); *Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 820 (10th Cir. 1991); *Ibrahim,* 834 F.2d at 54, none of these cases considered whether a deficiency in pre-deprivation proceedings could alter who must bear the burden of proof at trial. We do not reach this issue here.

## B. Requirement of Transaction-Specific Evidence

Euclid Market's next argument is that the district court erred by requiring it to produce transaction-specific evidence for every transaction raised by the USDA to meet its burden of proof. The government takes the position that a store's explanations of "customer shopping habits or its business practices" are never enough to show the agency's action was invalid; in other words, the store must provide transaction-specific evidence, like receipts or eye-witness testimony, to meet its burden of proof. Whether transaction-specific evidence is required presents a legal issue, and "[a]fter a bench trial, this court reviews a district court's . . . legal conclusions de novo." *First Dakota Nat'l Bank v. Eco Energy, LLC*, 881 F.3d 615, 619 (8th Cir. 2018) (alteration in original) (quoting *IPSCO Tubulars, Inc. v. Ajax TOCCO Magnathermic Corp.*, 779 F.3d 744, 747 (8th Cir. 2015)).

We agree with Euclid Market that such a standard is erroneous and that the district court applied such a standard in this case. A store's failure to provide transaction-specific evidence for every transaction does not inherently doom its case. Concluding otherwise would create an unnecessary tension with the fundamental principles of evidence. Credible evidence that is relevant and admissible under the Federal Rules of Evidence can and should be considered by the fact finder—here the district court—to determine if a store has met its burden to prove the agency's action was invalid. *See* 7 U.S.C. § 2023(a)(15) (providing that "the court shall determine the validity of the questioned administrative action"). This is true whether that evidence directly rebuts a specific transaction the USDA raised as suspicious or it serves to reduce the suspicion associated with a certain pattern of transactions the USDA identified. *See Irobe*, 890 F.3d at 380 n.3 (expressing skepticism of an interpretation of the standard to "always require a transaction-specific rebuttal of every transaction").

The government argues the district "court must retain the discretion to weigh the evidence during the de novo review . . . ." We wholeheartedly agree. In a trial de novo such as this, the determination of the "validity of the questioned

administrative action," 7 U.S.C. § 2023(a)(15), will always be a fact-intensive endeavor. Assuming the burden of proof is on the store, the quality and the quantity of the evidence it needs to meet its burden of proof may very well turn on the quality and the quantity of the evidence provided by the USDA that the store was trafficking. But a hardline rule that a store cannot prevail without transaction-specific evidence for each transaction raised by the USDA is inconsistent with the district court's rightful discretion in weighing all of the relevant, admissible evidence to determine the validity of the disqualification by a preponderance of the evidence.

The government also takes the position that if stores may meet the burden of proof with non-transaction-specific evidence, this will "provide a loophole that allows stores that traffick to participate in SNAP so long as they can explain the categories of suspicious transactions without legitimizing the transactions within the categories." We do not accept the government's doom and gloom prediction. Trial courts are skilled at weighing the probative value of the evidence, making credibility determinations, and assessing whether or not a party has met its burden of proof. Today's decision does not change that.

The district court's analysis shows it applied a rule always requiring a transaction-specific rebuttal of the transactions raised by the USDA. The district court emphasized the transaction-specific evidence: namely, the presence or absence of receipts for USDA-identified transactions and the lack of testimony regarding specific transactions. The district court found "Euclid Market [did not] have cash register receipts for 59 of the 154 transactions"; and "[n]o Euclid Market employee testified that he or she had any specific memory of the 59 transactions for which the Market d[id] not have receipts." *Euclid Market*, 2021 WL 5905962, at *4. The district court also found "[t]he cash register receipts that Euclid Market did produce ha[d] very little credibility in supporting that customers purchased SNAP-eligible items" because they would have been easy to create fraudulently. *Id.*

-10-

The district court only briefly mentioned Euclid Market's other evidence offered to show transactions were not likely trafficking.[4] If credited, this evidence may establish transactions raised by the USDA were legitimate. But rather than finding this evidence lacked credibility or was somehow inadequate, the district court stated that "general explanations do not suffice to demonstrate every transaction was legitimate." *Id.* at *5. The district court concluded, "without cash register receipts, or any other evidence surrounding those *specific transactions*, the Market did not establish these 59 transactions' legitimacy." *Id.* (emphasis added). The district court's statement indicates it applied an erroneous standard by requiring Euclid Market to provide transaction-specific evidence for every transaction in order to prevail.

This brings us to the government's alternative argument: even if the district court applied the incorrect legal standard, this court should affirm based on the district court's findings of fact or its statement in footnote four that the USDA would have satisfied a "substantial evidence" standard. We hesitate to rely on the district court's findings of fact for a simple reason: It is difficult to tell the extent to which the district court was reciting historical facts related to the administrative proceedings before the USDA or was making its own findings of fact. For example, at oral argument the government suggested the district court found Euclid Market was a "convenience store." However, what the district court said was the "[USDA] classified Euclid Market as a convenience store . . . ." *Euclid Market*, 2021 WL 5905962, at *1. In a trial de novo, however, such a finding by the USDA receives no automatic deference.

Regarding footnote four, the government suggests we should interpret the district court's statement there was "substantial evidence" supporting the USDA's

---

[4]As just one example of the kind of evidence Euclid Market presented to rebut the USDA's trafficking charge based on large transactions, Euclid Market alleged that it regularly sold large orders of chicken wings, other "meat bundles" and had special "deals on fish or ground beef or steaks," that were legitimately SNAP eligible, and that $200-$400 orders were not uncommon.

decision not as a term of art, but in its plain meaning as a "large amount of evidence." We decline to do so. The district court's statement that there was "substantial evidence" could reasonably be read as either the term of art with which we are familiar in the context of administrative law, or it could simply mean "a large amount of evidence," as the government suggests. In light of this ambiguity and how the legal-standard error permeates the district court's analysis, the prudent path is to remand to the district court to apply the correct legal standard.

### III. Conclusion

For the reasons above, we vacate the judgment and remand the case to the district court for further proceedings consistent with this opinion.[5]

SHEPHERD, Circuit Judge, dissenting.

I would affirm the judgment of the district court. I agree with the Court that a store may satisfy its burden of proof with evidence that "serves to reduce the suspicion associated with a certain pattern of transactions the USDA identified." Supra at 10. However, I dissent only because I believe that the district court in fact applied this standard.

The district court correctly noted that "[f]ailing to prove that even a single transaction of those at issue was not trafficking was enough to doom [Euclid] Market's case." R. Doc. 98, at 10; see also 7 U.S.C. § 2021(b)(3)(B); supra at 3. After doing so, it focused on the 59 transactions for which Euclid Market had *no* evidence of legitimacy. While the district court focused on these transactions because Euclid Market had failed to provide the related receipts, it nonetheless considered Euclid Market's more general explanations. As an example, it

---

[5]We leave the nature of the proceedings to the district court's discretion, but note that on appeal, Euclid Market sought a remand solely to give the district court an opportunity "to apply the correct legal standard to the evidence."

-12-

specifically referenced Euclid Market's "you buy; we fry" policy. However, it found that these explanations legitimized only *some* of the transactions. In doing so, the district court recognized that while both transaction-specific evidence (e.g., receipts) and more generalized evidence (e.g., store policies) are admissible, a store must still carry its burden to show that *each* transaction is legitimate. In other words, if a store's general explanations account for only a portion of the transactions, the store fails to carry its burden. Accordingly, in my view, the district court did not err by applying the improper standard; it simply found that Euclid Market's general explanations "d[id] not suffice to demonstrate every transaction was legitimate." R. Doc. 98, at 10; see Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 380 n.3 (1st Cir. 2018) ("One can easily imagine, for example, that a series of transactions labeled as suspicious for a certain reason . . . could *each and all* be rebutted by proof that the reason for suspecting them is wrong . . . ." (emphasis added)).

Further, I find that the district court did not base its judgment on the lack of specific evidence. Again, it focused on the 59 receipt-less transactions because Euclid Market provided no evidence to legitimize this specific group of transactions. However, it still found that the receipts Euclid Market provided offered little to legitimize the other transactions. It found that the receipts "ha[d] very little credibility in supporting that customers purchased SNAP-eligible items" because "[t]hey show only that a cashier entered that an item was SNAP-eligible—something the cashier would need to do, and easily could do, if he or she was trafficking through the EBT terminal." R. Doc. 98, at 7. *After* it discussed the transactions with the receipts, the district court ultimately concluded that "[t]he evidence [Euclid] Market adduced did not prove, by a preponderance of the evidence, that the agency's determination was invalid." R. Doc. 98, at 12. In my view, the district court's findings have little to do with the type of evidence provided (i.e., transaction-specific or general). Instead, its findings are focused upon the insufficiency of Euclid Market's evidence, whether general or transaction-specific, to satisfy its burden of proof for each transaction.

The Court takes issue with the brevity of the district court's reference to Euclid Market's other general explanations, but, in my view, the reference evinces the district court's appropriate consideration of the evidence, both general and specific. It is evident from the hearing transcript and the parties' proposed findings that Euclid Market's other explanations were before the district court, including Euclid Market's "meat bundles" and specials. Accordingly, it referenced the "you buy; we fry" policy merely as an illustrative example of Euclid Market's general explanations. See Johnson v. Hutchinson, 44 F.4th 1116, 1120 (8th Cir. 2022) ("But the [district] court need not address every piece of evidence or disputed point; it is sufficient for the court to 'set forth its reasoning with enough clarity that the appellate court may understand the basis of the decision.'" (citation omitted)). Further, I agree with the majority that Euclid Market challenges only the legal standard employed by the district court, not the determinations it reached under that standard. See supra at 12 n.5; see also Appellant's Br. 22 ("If this Court confirms the legal standard employed by the district court, then the district court reached the right result. It is just that easy."). Having recognized that the district court did in fact entertain Euclid Market's general explanations—and, thus, in my view, applied the correct standard—there is no basis for the Court to further evaluate the district court's consideration of that evidence.

But even so, the majority discounts the district court's other findings that explain why it did not find Euclid Market's evidence persuasive: the absence of a written price list for all the items sold in the store during the review period; the absence of a written list of all the periodic specials that Euclid Market offered during the review period; the less-than-helpful receipts; and the fact that Euclid Market had the equipment to help justify the purchases but had not installed it. The district court also noted the abundance of evidence that rendered Euclid Market's transactions suspicious: Euclid Market's EBT data; the high ALERT rankings; the comparison to similarly situated stores; and the fact that even if Euclid Market marked up its SNAP-eligible foods by 40%, it did not have enough stock to account for its SNAP purchases. While the Court debates whether the district court's reference to this evidence as "substantial evidence" is meant as a plain-meaning term or an

-14-

administrative-law term of art, I suggest that it does not matter. In the presence of the USDA's evidence, the district court found simply that Euclid Market had failed to carry its burden to explain all of its transactions by a preponderance of the evidence with either specific or general evidence.

For the foregoing reasons, I respectfully dissent from the Court's judgment. Believing that the district court applied the correct evidentiary standard, I would affirm the judgment of the district court.

_____